[Criminal No. 628.   Filed July 15, 1926.]

[247 Pac. 1103.]

# E. J. WOODSON, Appellant, v. STATE, Respondent.

1. HOMICIDE—SEDUCER MAY KILL HUSBAND ON REASONABLE BELIEF
THAT HUSBAND IS ABOUT TO KILL HIM OR INFLICT GREAT INJURY.
Seducer is entitled to every right of self-defense granted any other
man and if, as a reasonable man, he has grounds to believe that
injured husband is about to kill him or inflict great injury, he may
protect himself to extent of slaying him.

2. HOMICIDE.—Evidence of illicit relations between defendant and de-
ceased's wife *held* not admissible to show who was the aggressor,
where evidence was undisputed that deceased was the aggressor.

3. HOMICIDE.—Where identity of slayer is in doubt, evidence of illicit
relations between defendant and deceased's wife is admissible to
show who would have motive for killing.

4. HOMICIDE.—If A knocked B down without apparent reason and
turned away, whereupon B shot him, homicide is excusable if B
believed himself in imminent danger of death or great injury and
circumstances would have justified reasonable man in such belief,
but not otherwise.

5. HOMICIDE. — Where deceased knocked defendant down and turned
away towards his automobile and was either entering it, or reach-
ing into it, whereupon defendant shot him, issue of self-defense
*held* for jury.

6. HOMICIDE.—Where issue of self-defense was in doubt, evidence of
illicit relations between defendant and deceased's wife was admis-
sible as bearing on defendant's motives and state of mind.

7. CRIMINAL LAW.—In homicide case, that evidence of illicit relations
between defendant and deceased's wife tended to prove another

---

1. Right of self-defense against attack due to illicit relations
with wife or other relative of assailant, see note in 46 L. R. A.
(N. S.) 13. See, also, 13 R. C. L. 834.

3. See 8 R. C. L. 201.

4. Law of self-defense, see note in 74 Am. St. Rep. 717. See,
also, 13 Cal. Jur. 638; 13 R. C. L. 810. Standpoint of determination
as to danger and necessity to kill in self-defense, see note in 3
L. R. A. (N. S.) 535. See 13 R. C. L. 832.

6. Evidence of other offenses, see note in 105 Am. St. Rep. 977.
See, also, 8 R. C. L. 201.

7. Evidence of other offenses to show motive, see notes in 105
Am. St. Rep. 986; 7 Ann. Cas. 67; 8 Ann. Cas. 773; 62 L. R. A.
199. See, also, 13 Cal. Jur. 704; 8 R. C. L. 201.

crime by defendant did not render it inadmissible, since it was admissible to show motive and state of mind.

8. CRIMINAL LAW.—If evidence is admissible in criminal case for any purpose, that it incidentally tends to prove that defendant committed some other crime does not exclude it.

9. CRIMINAL LAW.—In homicide case in which evidence of illicit relations between defendant and deceased's wife was properly admitted, trial court was bound to use extraordinary care in instructing jury and in excluding improper matter.

10. CRIMINAL LAW.—Giving instruction, in a criminal case, when there is no evidence to justify it, is error, though instruction be abstractly correct.

11. CRIMINAL. LAW.—In homicide case in which evidence of illicit relations between defendant and deceased's wife was admitted, instruction as to slayer's lack of right to rely on self-defense if he was aggressor, where there was no evidence of aggression by defendant, *held* reversible error.

---

See (1) 30 **C. J.**, p. 50, n. 49, 50.   (2) 30 **C. J.**, p. 236, n. 13 New. (3) 30 **C. J.**, p. 186, n. 12.   (4) 30 **C. J.**, p. 58, n. 75, p. 61, n. 3. (5, 6) 30 **C. J.**, p. 186, n. 12, p. 329, n. 20.   (7–9) 16 **C. J.**, p. 600, n. 32, p. 601, n. 36, p. 962. n. 6.   (10, 11) 16 **C. J.**, p. 342, n. 97, p. 980, n. 91, p. 1043, n. 37.

APPEAL from a judgment of the Superior Court of the County of Maricopa.  M. T. Phelps, Judge. Cause reversed and remanded.

Messrs. Baker & Whitney, for Appellant.

Mr. John W. Murphy, Attorney General, and Mr. Earl Anderson and Mr. Frank J. Duffy, Assistant Attorneys General, for the State.

LOCKWOOD, J. — E. J. Woodson, hereinafter called defendant, was informed against for the crime of murder.   He entered a plea of not guilty, and upon trial was convicted of murder in the second degree, and sentenced to a term in the Arizona state prison of not less than twenty-five nor more than thirty-five

---

10.   See 8 **Cal. Jur.** 321.

years. He moved for a new trial and in arrest of judgment, which motions were by the court overruled, and from the judgment and sentence pronounced he has appealed to this court.

The homicide was admitted by defendant, but he claimed that he did it in his necessary self-defense. The facts and circumstances surrounding the actual killing are in very little dispute. It appears that about 6 P. M. on the evening of December 29th, 1924, defendant was at a gasoline service station owned by him and located at the corner of Seventh Street and Roosevelt, in Phoenix. While he was engaged in serving customers, one Norman McKenzie, hereinafter called the deceased, drove a four-door sedan into and around the grounds of the service station in a very rapid manner, finally stopping the car at the northwest corner of the station. Defendant stepped inside the station, picked up a revolver and stuck it inside his trousers, and then walked around the corner of the station towards deceased. The latter had in the meantime gotten out of the sedan, and the two men met a few feet from the car. Almost instantly after their meeting deceased struck defendant with his fist and knocked him flat on the ground, and immediately thereafter turned toward his car, and while he was either reaching into or in the act of entering the car, defendant, who was rising from the ground, fired the shot from which deceased died later in the evening. A search immediately after the shooting showed deceased had no weapons on his person or in the car.

There were a number of eye-witnesses to the shooting, and while their testimony differed in some slight respects, yet they were all in substantial agreement as to the above facts. In addition to showing what occurred at the time of the killing, the state intro-

duced evidence of certain matters occurring at various times during the preceding three months. Substantially, this evidence was as follows:

Mrs. Irma McKenzie, the wife of the deceased, testified that some months before the killing she had become acquainted with defendant; that practically at their first meeting he had commenced making love to her, notwithstanding he was married and knew she was also, and that such conduct on his part continued until it resulted in her seduction; that the Saturday night before the killing, which occurred on Monday, her husband apparently became suspicious that all was not well, and finding her and the defendant in an automobile together, sent her to her home, which was a short distance from the defendant's service station; that defendant and deceased then engaged in some loud and apparently quarrelsome conversation, but separated without any further difficulties; that that night she told her husband of her illicit relations with defendant. On Monday and shortly before the killing, she and her children were driving downtown when she saw the defendant, who motioned for her to stop. She did so, and he got out of his car and talked to her a few minutes. Just then deceased appeared, coming toward the McKenzie car. He called to defendant: "Say, wait a minute!" But the latter, who had just gotten into his car, hurried away. Deceased then took his wife home, let her and the children out, and drove off. A few minutes thereafter the killing occurred.

All of this testimony, which was quite full in its detail, as to the illicit relations of defendant and Mrs. McKenzie and their conduct leading up to it, was admitted over the most strenuous and repeated objections of defendant, and it is upon its admission that the majority of the assignments of error are based; the others being upon certain instructions given and

refused, and upon one or two other minor matters. Defendant corroborated substantially the testimony of Mrs. McKenzie in regard to the meetings of Saturday and Monday evening, but denied *in toto* all illicit relations or improper conduct with her, and claimed that he had done his best to avoid any trouble with McKenzie, and shot only when he believed as a reasonable man he was in danger of death or great bodily injury from the hands of deceased.

A situation such as exists in this case is one which calls for the most careful and painstaking consideration by an appellate court. On the one hand, we as men cannot but participate in the common human emotion of indignation at the possibility that a seducer, who has broken up a home, may not merely escape the consequences of his sin, but may slay the injured husband without punishment therefor; while, on the other hand, we are bound by our solemn oaths to administer the law as it exists, regardless of our personal feelings. And as to the general principle of law applicable there is and can be no doubt. Reprehensible as is the conduct of a seducer, by that one fact alone he is not made an outlaw whom the injured husband may slay at will. On the contrary, he has every right of self-defense granted to any other man, and notwithstanding his actions it is the unquestioned and long existing law that if as a reasonable man he has grounds to believe the husband is about to kill him or inflict upon him some great bodily injury, he has a right to protect himself even to the extent of slaying his assailant. Unless, therefore, it appears that the testimony of Mrs. McKenzie in regard to the seduction and the matters leading up thereto is legally admissible under all the facts and circumstances of this case, we can have no choice but to reverse the judgment, for it is obvious that testimony of that nature must have been prejudicial in

the highest degree before the jury, and in all probability the decisive factor in the verdict.

It is claimed by the state that this evidence was admissible for two purposes, first, as showing who was the aggressor in the affray resulting in the killing, and second, as tending to show motive on the part of the defendant. So far as the first contention is concerned, in this case the evidence of the state shows without dispute that deceased was the aggressor. He had, according to that evidence, quarreled with defendant Saturday night; he had attempted to follow him Monday night, and just before the killing had come upon defendant's own place of business in an aggressive manner and had, as soon as he got close enough, knocked the latter down. Nor, indeed, was it seriously contended by the Attorney General upon the oral argument of this appeal that the admission of the ·testimony can be sustained upon this ground. It is, however, urged that it is admissible to show the true motive of defendant at the time he shot.

It is universally recognized that the jealous rage of a husband is a frequent cause for his slaying the seducer. Though it is not always realized at the first thought, yet consideration of human nature will show that a lover can be equally jealous, and experience teaches us if opportunity and security offer he will slay the husband as readily and for the same reason. There are many men to-day who would play the part of David to some Uriah did they but have the opportunity and the power. The authorities are practically unanimous that where the identity of the slayer is in doubt, evidence of this nature is admissible as showing who would have a motive to do the killing. 30 C. J. 186. Indeed, this is not denied by defendant, but he contends where the killing itself is admitted and the plea is self-defense a different rule applies,

and particularly when, as in this case, deceased was the aggressor in the affray.

Let us analyze the principle contended for. A and B meet, and A knocks B down without any apparent reason or provocation, and then turns away, whereupon B shoots A and kills him. Is B guilty of a crime? This depends undoubtedly on the state of B's mind at the time he fired the fatal shot. Now, it is possible that B may have acted under any one of three different states of mind: First, he may have believed himself in imminent danger of death or great bodily injury, and the circumstances may have been such as to have justified a reasonable man in such belief. Second, he may have honestly so believed, but the circumstances may not have been such as to justify a reasonable man in so believing. Third, he may have had no such belief, no matter what the appearances were, but have acted from some other motive not sufficient in law to excuse the killing. Under the law A is excusable in the first case, but guilty of unlawful homicide in the second or third.

There are, then, two primary facts to be determined in a case of this kind. The first is whether or not, under the circumstances as they appeared to the defendant, the ordinary reasonable man would have been justified in apprehending serious injury or death at the hands of A, and the other is, did B actually have such apprehension and act on that alone? Any evidence which will shed light on either of these two points is logically material and, unless barred by some special rule of law, is legally admissible. Now, does the fact that B has had illicit relations with A's wife and believes A has discovered it tend to illuminate either of the above points? We think there is no question it does bear on B's actual motives. On the assumed facts there is certainly a question for the jury as to whether B really believed himself in danger

or not, and if such be true a fact which all human
experience shows is one of the strongest inducements
to an unlawful killing is admissible as bearing on
the real condition of B's mind, and the truth of his
plea of self-defense.  *People* v. *Cook,* 148 Cal. 334, 83
Pac. 43; *People* v. *Brown,* 130 Cal. 591, 62 Pac. 1072;
*State* v. *Reed,* 53 Kan. 767, 42 Am. St. Rep. 322, 37
Pac. 174; *Commonwealth* v. *Ferrigan,* 44 Pa. 386.

In the case at bar the undisputed facts certainly
made an issue of self-defense for the consideration
of the jury.  On the one hand, defendant was at his
own place of business, deceased had previously threat-
ened him, and had actually just knocked him down;
on the other, defendant had armed himself, had gone
around to meet deceased, the latter was unarmed, and
was going away from defendant when the shot was
fired.  Certainly we could not say such evidence would
not have supported a verdict either of manslaughter
or not guilty.  The issue being thus in doubt, we think
the evidence of illicit relations between defendant and
deceased's wife was admissible as bearing on his true
motives and state of mind, when he fired the fatal
shot.

Nor do we think the fact that it tended also to
prove another crime on the part of defendant renders
it inadmissible.  The better rule of law, and one
which this court has specifically approved, is that if
evidence is admissible in a criminal case for any pur-
pose, the fact that it incidentally tends to prove the
party against whom it is offered has committed some
other crime does not bar it.  *Crowell* v. *State,* 15
Ariz. 66, 136 Pac. 279; *Lawrence* v. *State,* 29 Ariz.
247, 240 Pac. 863.  But when evidence of this char-
acter is admitted it is the duty of the trial court to use
extraordinary care in instructing the jury and in see-
ing that no improper matter is allowed to get before
it.  The evidence of Mrs. McKenzie, if believed by

the jurors, and it is plain from the verdict they must have believed it, presented as a whole a situation bound to create in their minds a feeling of hostility and prejudice in the highest degree against defendant. According to the state's theory, defendant had deliberately seduced the wife of deceased, and then, when the latter resented the situation, had wilfully killed him. We think it is not too much to say it is highly probable any jury which believed Mrs. McKenzie's story to be true would have convicted the defendant no matter what the facts were surrounding the actual killing, unless the court had been meticulously careful and explicit in stating the law of self-defense under such circumstances, and in impressing upon the jurors that they could not convict the defendant of murder simply because he had committed adultery.

It is therefore necessary that we scrutinize the instructions given and refused with more than the usual care. An error which would be harmless in some cases might be of vital importance under circumstances like those presented to the jury in this one. The court, among the instructions, gave the two following:

"I further instruct you, gentlemen, in relation to the law of self-defense, that one cannot claim its benefit if he has intentionally put himself where he knows or believes he will have to invoke its aid, for no one has a right to kill another unless such killing was apparently necessary and unavoidable. The taking of human life is a matter of such deep signficance that it cannot be justified by some slight appearance of danger, and if the defendant was at fault in creating the situation of danger, his right of self-defense would not arise until he had first done all that reasonably could be done by him to avoid the necessity of killing his assailant in order to protect himself. . . .

"The law of self-defense does not imply the right to retaliate on another for real or supposed injuries, nor for revenge. I therefore charge you that if you find that the defendant sought, brought on, or voluntarily entered into a difficulty with the deceased for the purpose of seeking vengeance upon him for some supposed or real injury, then the defendant cannot avail himself of the law of self-defense, no matter how great the danger, or how imminent the peril which confronted him. The law holds him to a strict accountability under such circumstances, unless he first really, and in good faith, endeavored to withdraw from the conflict before resorting to the extremity of taking a human life."

Assuming that these instructions were correct as abstract propositions of law, yet the evidence for the state proved conclusively that defendant did not seek, bring on or voluntarily enter into any difficulty with the deceased for any purpose whatsoever. On the contrary, the evidence is uncontradicted that up to the time he was knocked down by deceased he had done nothing while he was at the service station that evening which he had not an absolute right to do. Even though an instruction may be abstractly correct, it is error to give it when there is not some evidence to justify it. 16 C. J. 1043. Were the facts in this case of such a nature that we could say the jury was not misled by the instructions, notwithstanding they were erroneous, we would not reverse the case on this ground. It appears to us, however, that in view of the whole situation the instructions were not only error but highly prejudicial. A jury would naturally assume, from the fact the court instructed on the theory of an aggression by defendant, that there was evidence in the record from which it could legally draw the conclusion that he had brought on the affray. There was no question as to who was the aggressor, and the only issue for the consideration of the jury was whether defendant really believed

from the situation he was then in imminent danger and shot solely to protect himself, or was at the moment he fired acting on some other motive.

In view of the nature of all the evidence on the issue of self-defense, we believe erroneous instructions, which apparently authorized the assumption defendant was the aggressor, cannot be considered as harmless. Since for the reasons given the matter must be sent back to be retried, we need not discuss the other assignments of error.

The judgment of the superior court of Maricopa county is reversed and the cause remanded for a new trial.

McALISTER, C. J., and ROSS, J., concur.